2009-15-11 Mr. Byron May it please the Court. The District Court in this case committed several fundamental errors evincing a craft approach to obviousness that is inconsistent with the Supreme Court's direction in KSR and with this Court's precedent. And I'd like to discuss three of those errors this afternoon. First, the District Court's overly limited approach to the selection of a lead compound. Second, the failure to recognize the structural similarity between the patented compound and the prior Art 902 compounds. And third, the District Court's conclusions that a person of ordinary skill in the art would not have been motivated to make the small change at the for position by using a known option that would not, a known option that worked. Mr. Byron. With the 902 compounds for alkyl compounds, in other words, lipophilic, whereas the claimed compound was a hydroxypropyl? Yes, Your Honor. There was considerable difference. That's not lipophilic. Well, it's not a considerable difference on the record of this case. The record of this case establishes, first of all, that there are hydroxypropyl compounds in the prior Art. There are hydroxypropyl compounds. The hydroxypropyl compounds. There's a hydroxyalkyl compound found in Exhibit 18, found in Example 118 of the 069 patent. 118 is pretty deep in that patent. And my examination of that patent shows that there are mostly 4-chloro compounds. In fact, if you look at Column 13, for 3 compounds, there's a long list, a couple of dozens, almost all of them are 4-chloro or trifluoromethyl. None of them are hydroxyalkyl or hydroxypropyl. In fact, Example 118, deep and buried in that patent, isn't a hydroxypropyl either. No, Your Honor, but it is a hydroxyalkyl. So aren't you just looking backwards to find something? Well, the question is whether a person of ordinary skill in the Art who has familiarity with, everything in the Art, would find that as a reasonable place to start. Actually, the reasonable place to start, we believe, is the 902 compounds. And then starting with that structure, looking back at what DuPont had developed, DuPont being the leader in this field and being the only one that had developed a successful drug, the Losartan drug that came out of the 069 patent. Is that a 4-chloro also? I'm not sure, Your Honor. I believe it is. I think it is too. Let me ask a question. Perhaps it's sort of a naive question as somebody with no scientific background. Isn't it a fact that when you're dealing with these complex medical compounds, that very slight changes may have significant impact? You don't know ahead of time, but you hope something will happen, but you can make a very slight change and it may have no impact, or you can, in another case, make a very slight change and it will have a very great impact. Isn't that realistically so about chemical compounds? Yes, Your Honor. It is true that a slight change could do something very significant, or a slight change could not. But that isn't the issue. The issue in dealing with obviousness under Section 103 is whether you're dealing with the application of ordinary skill, or whether an ordinarily skilled artisan, in this case a medicinal chemist, would, looking at that prior art, have found a reason to attempt to make this modification, and if that person with that background has a reason to attempt that modification. And here, the change at the 4 position, the evidence showed, first of all, that all of the positions of this structure had been fully optimized except the 4 position. That was the only place people were going to have to go to make these changes. And to be making changes, when you look at the fact that Example 118 worked, in the sense that it had binding affinity, it was one of the most significant compounds according to the testimony of the plaintiff's own expert. It was one of the most significant compounds as part of the 069 patent. You know that this works. There's a limited number of techniques that you can use at this position on the ring. The question is, is that the application of ordinary skill, or is that the application of something different? I would suggest that on this record and under the precedent, using the flexible approach to obviousness that the Supreme Court and KSR has directed that these cases be evaluated under, looking at, for example, the history in the Graham case and Justice Clark's opinion in the Graham case, it becomes apparent that the purpose of Section 103 was to limit patentability. Situations didn't involve just simply making a small change using a known technique. The idea was to make it something really significant in terms of the application of the expertise. That should have been the issue in this case. But there was no prior art showing the 4-hydroxypropyl. And moreover, example 118, which you cite, as I say, buried deep into this patent, which is not directed to hydroxyalkyl compounds in general. Even that compound had a 5-chloro, whereas the compound olmosatin before us has a 5-carboxydro, with an ester. I mean, you're only three steps away. Well, the ester, the testimony, the admission during the patent prosecution proceedings was that the ester really didn't make that much of a difference. The active substance here that we're dealing with is olmosar. But the compound of the claim is olmosatin medoxavir, right? Yes. But the application, the use of this ester at the 5 position, this is like the situation that was before this court in Pfizer versus Apotex. You knew that you needed to use an ester at this position. It's like the selection of a salt in Pfizer versus Apotex. There are only a limited, there are a number of things you could do out of the chemist's toolbox. This is the application of ordinary skill at that point. But in Pfizer, the basic compound is the same, right? Yes, Your Honor. The salt could have been any of the several. And in this case, the ester, for purposes of looking at the medoxavir component, the medoxavir component could have been the same. But the issue here is whether a person of ordinary skill, looking at these test results, looking at what had happened, would be motivated to attempt to make this change. And the history of this case shows, the evidence here shows, that nobody was talking about lipophilicity until this litigation. Perhaps one of the strongest... But isn't that just a way of describing the four chloros? I mean, the four chloros were all over that 069 pattern. You're asking me a question of chemistry that I am not prepared to answer in terms of that description, Your Honor. I apologize. That's the case before us. Yeah, that is the case before us. But the issue here is, in terms of looking at lipophilicity, there is nothing in the prior part that mentions lipophilicity as an important... or as it really is having anything to do. There are some test results where you can see that certain substituents are lipophilic or non-lipophilic, and you can make some extrapolations from that. But nobody was talking about lipophilicity in terms of any teaching away or teaching toward. There were just examples. Dr. Yanagisawa, who developed oligosaccharides for Daiichi, testified that his notes didn't show that they were looking at lipophilicity at this point. The evidence showed that, first of all, that 902 compounds had an increased oral activity over low sarcoma. That gave you an obvious structure. The structure here between the 902 compounds and ombosartan and medoxamil is not all that... It is structurally similar. It doesn't have to be structurally identical. It is structurally similar. And the question then becomes, would a person of ordinary skill in the art have been motivated to make this change at the fore position, knowing that that is the only place to go to attempt to improve upon the existing... Is that a factual or legal issue? Pardon me, Your Honor? Isn't that a factual issue? It is a question of law, ultimately, for this court as to whether under the facts the invention is obvious. I'm aware of the standard of review, but I'm asking you whether the proposition you've been arguing isn't a factual question. Well, I believe it is a legal question for this reason, Your Honor. The district judge in this case rendered an opinion that is at war with what this court has directed in terms of taking a flexible approach to following the dictates of the Supreme Court and KSR. For example, in Takeda, this court said, you need a reason to start. You don't need to look for the best. You don't need to look at where the most data is. The question is, is there a reason to start? The district court did not do that. And in Pullman v. Swint, the Supreme Court has held that where the district court makes a factual finding based upon an error of law, and I would suggest that that is precisely what happened here, then the decision is reviewable as a question of law and may be reversed on the basis of that error. Taking a flexible approach doesn't mean to ignore some fundamental points of analysis that have been accepted for a long time in the way chemical patents are evaluated for obviousness. And we're not suggesting that this court do that. We're suggesting that using that approach would result in the conclusion that this is an obvious compound and is barred from patentability under Section 103. Thank you, Your Honor. I'm more than happy to save it for you. Thank you, Your Honor. Mr. Condi. Thank you, Mr. Court. The district court heard 10 days of testimony, rendered a 53-page opinion, and in that opinion, he concluded that the claims were not obvious. That opinion was based on predicate fact findings that were well supported by the record. In fact, most of the fact findings were supported by Myline's expert's testimony. Now, on appeal, Myline has to show that every one of those predicate fact findings were clearly erroneous. If this court decides that even one of them was not clearly erroneous, then it should affirm. What really is going on here is Myline is trying to retry the case. They're asking you to reconsider the evidence. Now, we don't have time to go through all of them, but I'd like to address some of the findings, the fact that Myline's counsel has... But there was a hydroxyalkyl compound in the 069 patent. Right. It was 118. Losartan was twice as potent as 118. And as you said, Judge Lurie, the vast majority of compounds in the 069 patent had either a chloral or a floral or some combination of multiple florals, making it even more lipophilic. And what we didn't hear this afternoon from Myline's counsel is much about what the 902 patent taught. Because remember, the 069 had Losartan, the first-generation compound. And then DuPont went to the 902 compounds, and they went at the 4 position, which is the key difference between the 069 and 902. They went more lipophilic. The 902 had 4 alkyl compounds. Correct. Now, appellants say, well, hydroxyalkyl. Pretty close. Your Honor, as you well know, these are 3-dimensional chemicals. They're not stick figures on a piece of paper. And the hydroxyisopropyl is significantly different than just an alkyl. For example, the hydroxyisopropyl is hydrophilic, is very soluble, and is capable of forming hydrogen bonds. The alkyl groups on the 902 patent is lipophilic, the opposite of hydrophilic. It's not very soluble, and cannot form hydrogen bonds. Is it also true that in a claimed compound there's a 5-carboxy group, whereas in 118 it's a 5-chloro? Yeah, and 118 has a 5-chloro. The claimed invention is claimed 13. It has the modoximil on it, which is completely different than the 902 compound. The 902 has either a carboxy group or an aldehyde group on it. And the modoximil was put on there to improve oral bioavailability. But your opponent says modoximil is just an old hat, like the salts in the Pfizer case. Well, the District Court heard all... First of all, the Pfizer case is much different. In the Pfizer case, like you indicated, the prior art had the active ingredient with a series of salts associated, disclosed in the art. What Pfizer said is, well, we found the active ingredient works better with this particular salt. This court decided that that later invention was obvious. We don't have that here. Almost salt was never disclosed in the prior one. It's not a situation where you have the active and then you add on a prodrug. In addition, the District Court considered all of the argument that Milan makes here today. And what he found, based on Dr. Healy's testimony, was that prodrugs would be used as, quote, a last resort. And what our expert, Dr. Lipinski said, is that you would try to modify the base compound itself. And when you came to the modoximo, there was no expectation that you'd have success. In fact, with the 902 compounds, DuPont later tried to put a modoximo on those compounds. They thought they would increase oral availability. But what happened was, instead of making it more orally potent, it ended up with a modoximo on it. The 902 compounds were less orally potent than the base compound. So you can't predict whether the modoximo would work or not. That's what the District Court found. It's based on evidence in the record. It's based on articles by DuPont and others. And that cannot be clear error. Going back to a few things that Counsel from Milan said, he said at one point that the 069 patent gave reason to attempt. I don't believe that's quite the right standard. That sounds more like obvious to try than whether there was motivation to make a combination in the prior art. I think that's a different issue. So let's talk about what the District Court said vis-a-vis the motivation issue. The District Court reviewed all prior art. He reviewed the 069 patent. And from that patent, he said, yes, there's a clear teaching that you should use a lipophilic group at the 4 position based on the compounds that existed, based on what the specification said, based on the data where you compare compounds that are the same except for one difference at the 4 position. And those so-called sub-series, which are mentioned in the briefs, every single sub-series, the lipophilic compound was more potent than the other compounds. And then he said, well, we have to continue the analysis and go to the 902 patent. He looked at the 902 patent. He said, well, the difference between 069 and 902 is that it's more potent. Dr. Weinstock, Milan's chemistry expert, said the 902 patent emphasizes, emphasizes the importance of lipophilic group at the 4 position. And the District Court didn't stop there. He then looked at the ARBs that were available at the time, the prior ARBs. Each one of them had a lipophilic group. And in fact, Dr. Weinstock admitted that none of the commercial ARBs except for Omosart and Vidoximil have a hydrophilic group at the 4 position. Based on all that evidence, he said, look, this is just like the Assay case. The Assay case said you wouldn't take the lead, what the defendant says is the lead compound, and take off the substituent that supposedly gives you the advantage over the prior ARB on that lead compound. Here we have a situation that's even more makes it more favorable to the patentee than Assay. Because in Assay, you may recall, the prior ARB said make it very lipophilic. The Assay inventors made it less lipophilic. Here the inventors didn't make it less lipophilic, they didn't make it neutral, they made it hydrophilic, the direct opposite. Your opponent is troubled by the use of the term lipophilic. I'm not sure why. There certainly is. First of all, what I think what he said is that, well, none of the prior ARBs says the word lipophilic. Well, all the experts agree that medicinal chemists, they look at the structures, they look at the compounds, they know whether they're lipophilic or hydrophilic. It's routine for them to look at those structures and know, just like you did, Judge Laurie, that, well, you know, the chlorines are lipophilic, it's well known, these compounds are all lipophilic. You don't need to spell it out. But even having said that, in the 069 patent, there's a specific discussion about how, when you make these compounds, you end up with what I refer to as regional isomers. And what that means is you get one compound that has, like 118, a chloryl at the 5 and a hydroxymethyl at the 4, and then Losartan, which has the reverse of the 4 and 5. And what the 069 patent says, every time you get that regional isomer pair, the lipophilic compound is more potent than the non-lipophilic. What's regional mean? Reversing the ring? Not reversing the ring, it's regional isomers referred to at the 4. Let's say, for example, as you're making the compounds, you may get one set of compounds at the 4 that will have chloryl and hydroxymethyl, and then the regional isomer will be in that mixture as well. And then, of course, you put it through a column, and you separate them out, and you look and see which ones are more active. The 069 patent gives that discussion in terms that medicinal chemists will understand, not laypeople. And Dr. Timmons, who was the project leader for the DuPont work, testified that that's what that statement means. And what that statement means is that every single time, the more lipophilic compound was more potent. I just want to touch on one last thing, which, well, two things. One is the teaching away argument. The district court said there was clear discouragement from making a hydrophilic compound at the 4 position. And that finding was based largely on, again, Dr. Weinstock's testimony. And one thing that I think Myron's counsel said today, oh, there aren't that many other 902 compounds. That's not what Dr. Weinstock said. In fact, at A411, when the court asked him whether you could make many changes to the 902 compounds, he said, absolutely. And in particular, he said, at the 4 position, you could go ahead and you could make other alkenes, you can make alkynes, and you can make alkenes. You can make three types of groups at that 4 position, making it more lipophilic, which would be consistent with the teaching of the compound. I just want to briefly touch on the lead compound. It was mentioned briefly by Myron's counsel. The fact of the matter is, is that the district court was very flexible here. He did exactly what this court instructed him to do. Is lead compound tantamount to closest point or not? Or is lead compound the best compound in the therapeutic class? It's the latter. It's the best compound in the therapeutic class. If you were to go back and say, well, what is the closest and, in fact, in the Takeda case, this court found that the closest prior art was not the lead compound, was not an appropriate lead. And the reason for that is, well, the lead compound may be the closest, but, of course, that analysis by its very nature is a hindsight one, right? You start with the claim compound and say, well, which one is the closest? The test that the district court did appropriately is, he looked at all the compounds that were available as of the prior art, and what he said is, well, Mylon, you have proved by clear and convincing evidence that the 902 compound should be the lead. And, in fact, what happened was our expert, Dr. Lipinski, did the same analysis that he would have done in the lab. He said, look, if I'm in the lab, if I want to make a better compound than what was known in the art, I'm going to look at all the art, and I'm going to chart it out. And I'm going to say, well, where does all the data show? And he made a chart. He made a chart, and I can tell you where it is in the record in a second, but he made a chart, and the interesting thing about the chart is that several other compounds had a lot of additional, had a lot of data on them that substantiated their activity. And our expert said, I would have started with one of those four. That's being a pretty flexible approach. The district court didn't limit his analysis to only one set of leads. He looked at all the art. I think that's what KSR instructs us to do. I'm certain that's what this court's precedent instructs us to do. If there's any other, unless there's any other questions, I'll relinquish the rest of my time. Thank you, Mr. Condon. Mr. Breyer has two minutes. On the regioisomer point, the fact that example 118 is a regioisomer of Losartan would be an indication that this is not something that would have been buried in the patent with respect to a person of ordinary skill in the art. That is something that a person of ordinary skill would look to, and Dr. Weinstock testified to that point with respect to the significance of that being a regioisomer. So why was it number 118, number one, and why, when there's a list of preferred compounds in column 13, was it not mentioned or anything close to it? It's not in. If you look at column 13, specifically preferred for antihypertensive activity are It did not show the best activity. That was Losartan, but it showed good activity, and that is why we believe that and why the expert testimony But you're saying that should be, quote, a lead compound Well, not 118. 902 should have been the lead compound, but a person starting with 902 as a lead compound as one of the lead compounds to be considered, it doesn't have to be the sole lead compound, but a person who is working with 902 as a lead compound would look back and see what DuPont had done before as the leader in this field, and would be looking at 118 and seeing that the use of the hydroxyalkyl group at the 4 position, and would be we believe, would be tempted to reasonably make a similar change. Look at who would start with number 1 just go reading through them, and then when he got to 118, he'd look and say, ah, that's it? Well, he's presumed to know what the prior order is, and 118 does stand out. Even Dr. Lipinski for Daiichi testified that that is one of the most significant compounds that was disclosed by DuPont in the 118 pact. Right, I come back to George Laurie's question, if it was one of the most significant compounds, why was it number 118? It's like the dialogue in Alice in Wonderland where they tell her that the king announces that all people more than a mile high, he says rule 46, all people more than a mile high leave the courtroom, and Alice says to him, you just made that up, and the king says, no, he says it's the oldest rule in the book, to which Alice replies, then why isn't it number one? And here, I'm puzzled by all, I don't know enough about how one drafts patents, but it seems to me somewhat strange to say that this thing, number 118, more than a hundred, this is one of the most critical items involved. Well, LoSartan was example 89 in that patent, and, ah, in terms of where 118 falls, it's in the midpoint, in terms of the ranking by effectiveness, so this is, and there are only 41 compounds as part of the 069 patent, so it's not like the Takeda case where somebody was going to have to look through millions, and again, the 902 patent involves only 6 compounds, Are there 117 ahead of number 118? Um, there are a number, not on the chart that rank them according to, and this chart is reproduced in our reply brief, Your Honor, and this, this is the type of information that a person of ordinary skill in the art is presumed to know, and presumably would be looking at in trying to determine how to improve upon a lead compound to, ah, to make the improvement on what was there existing. So your argument is that a person of ordinary skill in the art, familiar with the entire patent, wouldn't consider that to be 118 in interest, just because it's listed as 118. That's correct, Your Honor. That is correct. You'd be looking at its effectiveness, you would be looking at its binding ability, and that's how these things would be ranked, and you take that into account with what the 902 patent teaches about the fact that you don't need electron withdrawing at the 4 position in order to have oral efficacy. The oral effectiveness of the 902 compounds was 2 to 4 times greater than Losartan. When you put all that together, yes, this would have been obvious to a person of ordinary skill in the art. Thank you, Mr. Breyer. We'll take the case under advisement. Thank you, Your Honor. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. Court is adjourned.